**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **WENDY TURNER, OLIVIA THOMPSON** and **AIDEN NUNEZ**, | Case No.: 1:23-cv-14709 |
| Plaintiffs, | |
| vs. | |
| **NCR CORPORATION**, a foreign corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

WENDY TURNER ("Turner"), OLIVIA THOMPSON ("Thompson") and AIDEN NUNEZ ("Nunez") (collectively "Plaintiffs"), through counsel, for their Complaint against Defendant, NCR CORPORATION ("Defendant" or "NCR"), state:

### NATURE OF THE CASE

1.      This is an action to recover statutory damages and for injunctive relief arising out of Defendant's unlawful collection, receipt, use, possession, retention and disclosure of the personal biometric identifiers and biometric information of Plaintiffs in violation of the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 (2008).

### THE PARTIES

2.      Plaintiff Turner is a natural person who is domiciled in Illinois.

3.      Plaintiff Thompson is a natural person who is domiciled in Illinois.

4.      Plaintiff Nunez is a natural person who is domiciled in Illinois.

5.      Defendant NCR is a Maryland corporation with its principal place of business in Atlanta, Georgia.

1

6.     Defendant conducts business transactions in the State of Illinois, including at its Aloha POS retail store located at 9701 W. Higgins Road, Suite 120, Rosemont, Illinois 60018, and Defendant committed the statutory violations alleged herein in Illinois.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds $75,000.00[1] exclusive of punitive damages, and/or interest and costs, and is between citizens of different States.

8.     Each Plaintiff is a citizen of Illinois.

9.     Defendant is a Maryland corporation with its principal place of business in Atlanta, Georgia.

10.     This Court has personal jurisdiction over Defendant because it conducts substantial business in Illinois.

11.     Venue lies in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and Defendant can be found in this District.

## RELEVANT FACTS

12.     Defendant NCR is a creator and vendor of software, hardware, and service solutions, providing services to different sectors including more than 100,000 restaurants.[2]

13.     Of primary importance among the products developed, manufactured and sold by NCR to its customers in the restaurant industry are biometric-enabled Point-of-Sale ("POS") systems, comprised of POS terminals and cloud-based POS software, like NCR Aloha.

---

[1] Plaintiffs seek statutory, liquidated damages of $1,000 for each negligent violation of BIPA and $5,000 for each reckless or intentional violation of BIPA and allege that there were not less than 30,000 BIPA violations.
[2] *See Run your restaurant with ease, available at* *https://www.ncr.com/restaurants* (last accessed October 3, 2023).

14.     The Aloha all-in-one Restaurant POS provides NCR's customers in the restaurant industry with kitchen solutions, digital ordering, reporting and analytics, and management tools, including tracking and managing workers' time and attendance.[3]

15.     Each NCR POS terminal model is configured for use in conjunction with a biometric fingerprint scanner, which requires each worker to scan his or her fingerprint or thumbprint at the biometric-enabled NCR POS system in order to access the terminal, whether to clock in or clock out, or to input a food order.

16.     NCR's biometric hardware and software authenticate workers' identities by capturing and utilizing their biometric identifiers and/or information.

17.     Non-party Wingstop utilizes a biometric-enabled NCR POS system, opting to use the time and attendance application on the biometric-enabled NCR POS system. The Plaintiffs' biometric data captured at Wingstop's biometric-enabled POS is automatically uploaded to an NCR database, where it is managed, maintained, and stored on NCR's hosted environments and servers.

18.     Plaintiffs, all current or former Wingstop workers, were required to scan their fingerprints or thumbprints at a biometric-enabled NCR POS system to be used as an authentication method to track their time worked and to access the POS terminal.[4]

19.     Specifically, Plaintiffs were required to scan and enroll their fingerprints or thumbprints with Wingstop's NCR database at Wingstop's biometric-enabled NCR POS system.

---

[3] *See Aloha Restaurant POS solutions give you everything you need to manage your restaurant fearlessly, available at https://www.ncr.com/restaurants/aloha-restaurant-pos-system* (last accessed October 3, 2023).
[4] *Michele Johnson and Christina Skeldon v. NCR Corporation*, was originally filed on May 4, 2022 in the Circuit Court of Cook County, IL (Case No. 2022CH04265) and removed to the Northern District of Illinois, Eastern Division, on June 10, 2022 (Case No. 1:22-cv-03061). Each Plaintiff is a putative member of the class the *Johnson* case seeks to certify. Each Plaintiff will timely and properly request to be excluded from the *Johnson* settlement class.

NCR collected and/or otherwise obtained Plaintiffs' biometric data upon Plaintiffs' enrollment at Wingstop's biometric-enabled NCR POS system.

20. Plaintiff Turner has worked as a cashier/shift lead for Wingstop from 2019 to the present at its restaurant located at 850 W. 63rd Street, Chicago, Illinois 60621.

21. Plaintiff Turner is required to scan her right thumbprint at the biometric-enabled NCR POS system utilized by Wingstop to clock in and clock out of work each day, to access the POS terminal for customer sales, and to close out registers.

22. Plaintiff Thompson has worked as a cashier for Wingstop from 2016 to the present at its restaurant located at 1712 W. 119th Street, Chicago, Illinois 60643.

23. Plaintiff Thompson is required to scan her fingerprint or right thumbprint at the biometric-enabled NCR POS system utilized by Wingstop to clock in and clock out of work each day and to access the POS terminal for customer sales.

24. Plaintiff Nunez worked as a cook for Wingstop from December 2022 to September 2023 at its restaurant located at 3326 N. Western Avenue, Chicago, Illinois 60618.

25. Plaintiff Nunez was required to scan his thumbprint at the biometric-enabled NCR POS system utilized by Wingstop to clock in and clock out of work each day.

26. Typically, biometric devices function by capturing an image of a worker's fingerprint or thumbprint when the worker enrolls at the biometric device. From the image, unique features of the fingerprint are extracted to create a unique template associated with the worker, which is stored in an NCR database. Each time the worker subsequently provides his or her fingerprint or thumbprint at the biometric device, the device compares the unique features of the input fingerprint or thumbprint against the stored templates of each set of fingerprints or thumbprints enrolled to verify the worker's identity.

27.     When Plaintiffs first used the biometric-enabled NCR POS system, they were required to have their fingerprint or thumbprint scanned in order to enroll them in one or more NCR databases, from which NCR collects and/or otherwise obtains Plaintiffs' biometric data.

28.     Thereafter, NCR again collects and/or otherwise obtains Plaintiffs' fingerprint or thumbprint data upon each subsequent scan of their fingerprint or thumbprint to clock in and clock out of work, or to otherwise access the POS terminal.

29.     Plaintiffs were required to scan their fingerprints or thumbprints at Wingstop's biometric-enabled NCR POS system each time they accessed the POS terminal, including to clock in and out of work.

30.     NCR collected and/or otherwise obtained Plaintiffs' biometric data captured by the biometric-enabled POS terminals optimized with NCR's POS software, including but not limited to NCR Aloha.

31.     All biometric-enabled NCR POS systems are designed and constructed with a network interface, which provides for transmission of biometric data collected and/or obtained from biometric-enabled NCR POS systems to NCR's servers and to third parties who host that data.

32.     NCR discloses the biometric data of workers, including Plaintiffs, to third parties, which receive, store, use, access, or otherwise process the biometric data for the purpose of providing their services, including the back-up storage of data and provision of IT services.

33.     NCR developed and markets cloud-based software platforms, including NCR Aloha, through which NCR actively manages, maintains and stores data, including biometric data, collected from its biometric-enabled POS terminals in a single, centralized location on its hosted environments and servers.

34. NCR accesses its servers, where data collected from its POS terminals is stored, for various purposes, including to provide support services to its employer-customers, including Wingstop.

35. NCR failed to sufficiently inform Plaintiffs who were enrolled with its biometric-enable POS systems: (1) that NCR is collecting, obtaining, storing, disseminating, or using their sensitive biometric data; (2) the extent or the purposes for which it does so; or (3) to whom the data is disclosed.

36. NCR failed to sufficiently inform Plaintiffs that, through its biometric-enabled POS terminals and cloud-based POS software, it collects, maintains, stores, disseminates, and uses their biometric data.

37. NCR failed to sufficiently inform Plaintiffs that it discloses or disclosed their biometric data to other, currently unknown, third parties, which host the biometric data in their data centers.

38. NCR failed to properly inform Plaintiffs of the purposes and duration for which it collects their sensitive biometric data.

39. NCR failed to obtain Plaintiffs' consent before collecting, obtaining, disclosing and/or disseminating their biometric data to third parties.

40. Despite its collection of Plaintiffs' biometric data, NCR failed to secure informed consent from Plaintiffs authorizing NCR to collect, store, use, or disclose their biometric data.

41. NCR subsequently collected and stored Plaintiffs' biometric data in NCR's cloud-based database(s), maintained on NCR's hosted environments and servers, each time they scanned their fingerprints to clock in or clock out or otherwise access the biometric-enabled NCR POS system.

42.     NCR did not properly inform Plaintiffs in writing of the specific limited purpose(s) or length of time for which their fingerprint data was being collected, obtained, stored, used and/or disseminated.

43.     Plaintiffs have never seen, been able to access, or been informed of any publicly available biometric data retention policy or guidelines developed by NCR, nor have they ever seen, been able to access, or been informed of whether NCR would ever permanently delete their biometric data.

44.     Plaintiffs have never been provided with, nor have they ever signed, a written release allowing NCR to collect, capture, obtain, store, use, and/or disseminate their biometric data.

45.     Plaintiffs have continuously and repeatedly been exposed to the risks and harmful conditions created by NCR's multiple violations of BIPA as alleged herein.

46.     NCR used and stored a scan of Plaintiffs' fingerprint, thumbprint or hand geometry for purposes of time tracking and employee authentication.

47.     Alternatively, NCR's POS system collected, used and stored an encrypted mathematical representation of Plaintiffs' fingerprint's, thumbprint's or hand geometry's characteristics.

48.     In either event, NCR's POS system used, collected, and stored unique "biometric identifiers" and "biometric information," as both terms are defined below, belonging to Plaintiffs.

49.     NCR did not seek Plaintiff's consent prior to collecting, using or storing their biometric identifiers or information.

50. NCR is required to destroy Plaintiffs' biometric identifiers and information when the initial purpose for collecting, capturing, or obtaining such data had been satisfied or within three years of the worker's last interaction with the company.

51. Prior to collecting and/or receiving Plaintiffs' biometric identifiers or information, NCR did not inform Plaintiffs in writing that their biometrics were being collected, stored, and used.

52. Plaintiffs also did not consent to NCR disseminating or disclosing any of their biometric identifiers or information that it collected.

53. NCR profits through its marketing and distribution of its biometric-enabled POS terminals and cloud-based software platforms to Illinois employers, such as Wingstop, as a superior option to traditional POS solutions because it uses individual worker's biometric identifiers to create a user-unique audit trail that can facilitate authentication and monitoring of POS terminal access and accurate time collection to eliminate buddy punching and ghost employees.[5]

54. NCR collected, used, stored, disclosed or disseminated Plaintiffs' biometric identifiers or information in violation of BIPA not less than 30,000 times during the course of Plaintiffs' employment with Wingstop within the last five years.

**HARM TO PLAINTIFFS**

55. While there are tremendous benefits to using biometric time clocks in the workplace, there are also serious risks. Unlike key fobs or identification cards—which can be changed or replaced if stolen or compromised—fingerprints are unique, permanent biometric identifiers associated with the employee. This exposes employees to serious and irreversible

---

[5] *See https://www.ncr.com/blogs/payments/track-employee-hours* (last accessed October 3, 2023).

privacy risks. For example, if a fingerprint database is hacked, breached, or otherwise exposed, employees have no means by which to prevent identity theft and unauthorized tracking. If a database containing fingerprints or other sensitive, proprietary biometric data is hacked, breached, or otherwise exposed – like in the recent Yahoo, eBay, Equifax, Uber, Home Depot, MyFitnessPal, Panera, Whole Foods, Chipotle, Omni Hotels & Resorts, Trump Hotels, and Facebook/Cambridge Analytica data breaches or misuses – employees have no means by which to prevent identity theft, unauthorized tracking or other unlawful or improper use of this highly personal and private information.

56.     A nefarious market already exists for biometric data. Hackers and identity thieves have targeted Aadhaar, the largest biometric database in the world, which contains the personal and biometric data – including fingerprints, iris scans, and a facial photograph of over a billion Indian citizens. *See* Vidhi Doshi, *A Security Breach in India Has Left a Billion People at Risk of Identity Theft*, The Washington Post (Jan. 4, 2018).[6]

57.     In 2015, a hacking event of the U.S. Office of Personnel Management caused 5.6 million people's fingerprints to compromised. *See* April Glaser, *Biometrics Are Coming, Along with Serious Security Concerns*, WIRED (Mar. 9, 2016).[7]

58.     By 2019, biometrics were expected to become a 25-billion-dollar industry with more than 500 million biometric scanners in use around the world. Chiara A. Sottile, *As Biometric Scanning Use Grows, So Does Security Risk*, NBC NEWS: MACH (July 24, 2016, 6:29 PM).[8]

---

[6] Available at https://www.washingtonpost.com/news/worldviews/wp/2018/01/04/a-security_-breach-in-india-has-left-a-billion-people-at-risk-of-identity-theft/?utm_term=.b3c70259f138. (last accessed 10/03/2023).
[7] Available at https://www.wired.com/2016/03/biometrics-coming-along-serious-security-concerns (last accessed 10/03/2023).
[8] Available at https://www.nbcnews.com/mach/mach/biometricscanning-use-grows-so-do-security-risks-ncna593161 (last accessed 10/03/2023).

59.     The use of biometric information for timekeeping has become so common in an employment setting as to be almost ubiquitous. Companies use biometric devices as a more secure way to authenticate employee identity for timekeeping, to grant access to sensitive data, or to facilitate onboarding and offboarding. Companies use biometric systems to ensure that workers using a time clock are who they say they are and to avoid "buddy punching." Biometric time clocks that use fingerprint scanning or facial recognition can also help companies better comply with labor laws by ensuring employees clock in and out accurately. *See* Jay Hux, *Collecting Employee Biometric Data Could Prove Costly in Illinois*, SHRM: ST. & LOC. UPDATES (Sept. 19, 2017).

60.     On May 18, 2023, the Federal Trade Commission voted 3-0 and adopted a new policy statement on Biometric Information and Section 5 of the Federal Trade Commission Act.[9] The decision to adopt the new policy reflects the FTC's significant concerns about biometric information and related technologies with respect to privacy, security and other issues.

61.     In commenting on the above policy statement, Samuel Levine, Director of the FTC's Bureau of Consumer Protection, said: "In recent years, biometric surveillance has grown more sophisticated and pervasive, posing new threats to privacy and civil rights," "Today's policy statement makes clear that companies must comply with the law regardless of the technology they are using."[10]

62.     In late 2007, a biometrics company called Pay by Touch - which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions - filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature because suddenly there was a serious risk that millions of fingerprint records - which, like other

---

[9] Available at https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf. (last accessed 10/03/2023).
[10] *See* https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-warns-about-misuses-biometric-information-harm-consumers (last accessed 10/03/2023).

unique biometric identifiers, can be linked to people's sensitive financial and personal data - could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who had used that company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

63.     Recognizing the need to protect its citizens from situations like these, in 2008, Illinois enacted BIPA in light of the "very serious need [for] protections for the citizens of Illinois when it comes to [their] biometric information."[11]

64.     BIPA was enacted with the understanding that "the full ramifications of biometric technology are not fully known." 740 ILCS 14/5(f). The legislature specifically found that persons who have their biometrics taken unlawfully are at increased risk of future injury. *Id.*

65.     The legislature recognized that biometrics are unlike other unique identifiers used to access finances or other sensitive information. "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."[12]

66.     To address this legitimate concern, Section 15(b) of BIPA provides that:

> No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

---

[11] 95th Ill. Gen. Assem. House Proceedings, May 30, 2008, at 249 (statement of Representative Ryg), available at http://www.ilga.gov/house/transcripts/htrans95/09500276.pdf.
[12] 740 ILCS 14/5(c).

> (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.[13]

67.     For BIPA purposes, a "biometric identifier" is a personal feature that is unique to an individual and specifically includes fingerprints and thumbprints.

68.     BIPA defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based upon an individual's biometric identifier used to identify the individual."[14]

69.     BIPA defines a "written release" as "informed written consent." 740 ILCS 14/10.

70.     Biometric identifiers include retina and iris scans, voiceprints, scans of hand and face geometry, and fingerprints. *See* 740 ILCS 14/10.

71.     Biometric information is separately defined to include any information based on an identifier that is used to identify an individual. *See id*.

72.     BIPA also establishes standards for how companies must handle Illinois citizens' biometric identifiers and biometric information. *See* 740 ILCS 14/15(c)-(d). BIPA makes it unlawful for companies to "sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." Furthermore, no company may "disclose,

---

[13] 740 ILCS 14/15(b).
[14] *Id*.

redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless":

> (1) the person or customer consents to the disclosure or redisclosure;
>
> (2) the disclosure or redisclosure completes a financial transaction requested or authorized by the person or customer;
>
> (3) the disclosure or redisclosure is required by State or federal law or municipal ordinance; or
>
> (4) the disclosure is required pursuant to a valid warrant or subpoena issued by a court of competent jurisdiction.

*See* 740 ILCS 14/15(c)-(d).

73. Ultimately, BIPA is an informed consent statute. Its narrowly tailored provisions place no absolute bar on collecting, sending, transmitting or communicating biometric data. For example, BIPA does not limit what kinds of biometric data may be collected, sent, transmitted, or stored. Nor does BIPA limit from whom biometric data may be collected, to whom it may be sent or transmitted, or how it is stored. BIPA merely mandates that entities wishing to engage in that conduct must make proper disclosures and implement certain reasonable safeguards.

74. Plaintiffs have continuously and repeatedly been exposed to the risks and harmful conditions created by Defendant's repeated violations of BIPA alleged herein.

75. Defendant knew, or was reckless in not knowing, that the biometric biometric-enabled NCR POS systems, including biometric timekeeping system, that it used would be subject to the provisions of BIPA, a law in effect since 2008, yet ignored and wholly failed to comply with the statute.

76. Alternatively, Defendant negligently failed to comply with BIPA by failing to adhere to the reasonable standard of care in its industry with respect to Illinois citizens' biometric identifiers or information. 740 ILCS 14/15(e).

77.     Plaintiffs now seek statutory, liquidated damages under BIPA as compensation for the Defendant's multiple violations of BIPA.

78.     Plaintiffs also seek a declaration that Defendant's actions in contravention of BIPA are unlawful and to enjoin Defendant from further violations of BIPA.

79.     This lawsuit constitutes Plaintiffs' one and only chance at compensation for Defendant's violations of BIPA. Depending on how technology evolves years into the future, losing control of and ownership over very personal identifiers could have untold harmful consequences.

80.     The Illinois legislature concluded that the increased risk of future harm is a compensable loss under the BIPA. *Rosenbach v. Six Flags Entm't Corp.,* 2019 IL 123186, ¶ 35, 129 N.E.3d 1197, 1206 citing 740 ILCS 14/5(c) (noting increased risk of identity theft should biometrics be compromised); *Dillon v. Evanston Hosp.,* 199 Ill. 2d 483, 507, 771 N.E.2d 357, 372 (2002) (Illinois Supreme Court finding risk of future injury compensable as an element of damages in medical malpractice case). The legislature's decision is particularly reasonable given that the statute of limitations on BIPA claims presumably runs from the date of the collection of biometrics, whereas the future injury may not occur until after the statute has run.

81.     Plaintiffs seek an award of liquidated damages, which is appropriate given that this harm is difficult to quantify.

82.     No amount of time or money can compensate Plaintiffs if their biometric data is or has been compromised by the lax procedures through which Defendant collects, captures, obtains, stores, disseminates, and/or uses Plaintiffs' biometrics.

83. Moreover, Plaintiffs would not have provided their biometric data to Defendant if they had known that Defendant would retain such information for an indefinite period of time without their consent.

84. A showing of actual damages is not necessary in order to state a claim under BIPA. *See Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 40 ("[A]n individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under the Act, in order to qualify as an "aggrieved" person and be entitled to seek liquidated damages and injunctive relief pursuant to the Act"). 65. As Plaintiffs are not required to allege or prove actual damages in order to state a claim under BIPA, they seeks statutory damages under BIPA as compensation for the injuries caused by Defendant. *Rosenbach*, 2019 IL 123186, ¶ 40.

## COUNT I

### Violation of §15(a) of BIPA
### [Failure to Institute, Maintain, and Adhere to Publicly Available Retention Schedule]

85. Plaintiffs restate paragraphs 1 through 84 of the complaint as if set out here in full.

86. BIPA mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention - and, importantly, deletion - policy. Specifically, these companies must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the company's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS § 15(a).

87. Defendant is an entity registered to do business in Illinois and qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

88. Plaintiffs are each an individual who had "biometric identifiers" (in the form of fingerprints or thumbprints) collected by Defendant. *See* 740 ILCS 14/10.

89.     Plaintiffs' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

90.     Defendant failed to provide a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA. *See* 740 ILCS § 15(a).

91.     Defendant failed to make any written policy establishing a retention schedule and guidelines for permanent deletion of biometric data publicly available.

92.     Defendant lacks retention schedules and guidelines for permanently destroying Plaintiffs' biometric data when the purpose for collecting or obtaining such data has been satisfied or within three years of the individual's last interaction with the company.

93.     Plaintiffs have never seen, been able to access, or been informed of any publicly available biometric data retention policy or guidelines developed by Defendant, nor have they ever seen, been able to access, or been informed of whether Defendant would ever permanently delete their biometric data.

94.     Defendant knew, or was reckless in not knowing, that the biometric-enabled NCR POS systems, including biometric timekeeping devices, it used would be subject to the provisions of BIPA, a law in effect since 2008, yet completely failed to comply with Section 15 (a) of BIPA, or otherwise intentionally or recklessly failed to comply with Section 15 (a) of BIPA.

95.     Alternatively, Defendant negligently failed to comply with Section 15 (a) of BIPA by failing to adhere to the reasonable standard of care in its industry with respect to biometric information and the mandates of Section 15 (a) of BIPA.

96.     Plaintiffs seek statutory damages of $5,000 for each willful and/or reckless violation of Section 15(a) BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory

damages of $1,000 for each negligent violation pursuant to 740 ILCS 14/20(1); and reasonable attorneys' fees, costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## COUNT II

### Violation of §15(b) of BIPA
### [Failure to Obtain Informed Written Consent and Release
### Before Obtaining Biometric Identifiers or Information]

97.     Plaintiffs restate paragraphs 1 through 84 of the complaint as if set out here in full.

98.     BIPA requires a company to obtain informed written consent from its workers before acquiring their biometric data.

99.     Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first: (1) informs the subject…in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject…in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; **and** (3) receives a written release executed by the subject of the biometric identifier or biometric information…" 740 ILCS 14/15(b) (emphasis added).

100.    "A party violates Section 15(b) when it collects, captures, or otherwise obtains a person's biometric information without prior informed consent. This is true the first time an entity scans a fingerprint or otherwise collects biometric information, but it is no less true with each subsequent scan or collection." *Cothron v. White Castle System, Inc*., 2023 IL 128004 ¶ 24 (internal citation omitted).

101.    Informed consent is the "heart of BIPA." *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 626 (7th Cir. 2020).

102.     Defendant is an entity registered to do business in Illinois and qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

103.     Plaintiffs are each an individual who had "biometric identifiers" (in the form of fingerprints or thumbprints) collected by Defendant. *See* 740 ILCS 14/10.

104.     Plaintiffs' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

105.     Defendant collected, captured or otherwise obtained Plaintiffs' biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3).

106.     Defendant did not inform Plaintiffs in writing that their biometric identifier or biometric information was being collected or stored, or of the specific length of term for which their biometric identifiers and/or biometric information were being collected, stored or used before collecting, storing or using them as required by 740 ILCS 14/15(b)(1)-(2).

107.     Prior to collecting Plaintiffs' biometric identifiers and information, Defendant did not obtain a written release authorizing such collection. 740 ILCS 14/15(b)(3).

108.     By collecting, storing, and using Plaintiffs' biometric identifiers or information as described herein, Defendant violated Plaintiffs' privacy in their biometric identifiers and information as set forth in BIPA *each time* the Defendant collected, captured, obtained, stored or used their biometric identifiers or information. *See* 740 ILCS 14/1, *et seq.*; *Cothron v. White Castle System, Inc.*, 2023 IL 128004 ¶ 24. "[T]he plain language of section 15(b) and 15(d) demonstrates that such violations occur with every scan or transmission." *Id.* At ¶ 30.

109.     Defendant knew, or was reckless in not knowing, that the biometric-enabled NCR POS systems, including biometric timekeeping devices, that it used would be subject to the

provisions of BIPA, a law in effect since 2008, yet completely failed to comply with Section 15 (b) of BIPA, or otherwise intentionally or recklessly failed to comply with Section 15 (b) of BIPA.

110.    Alternatively, Defendant negligently failed to comply with Section 15 (b) of BIPA by failing to adhere to the reasonable standard of care in its industry with respect to biometric information and the mandates of Section 15 (b) of BIPA.

111.    Plaintiffs seek statutory damages of $5,000 for each willful and/or reckless violation of Section 15(b) BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation pursuant to 740 ILCS 14/20(1); and reasonable attorneys' fees, costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## COUNT III

### Violation of §15(d) of BIPA
### [Disclosure of Biometric Identifiers or Information Without Obtaining Consent]

112.    Plaintiffs restate paragraphs 1 through 84 of the complaint as if set out here in full.

113.    BIPA prohibits private entities from disclosing, redisclosing or otherwise disseminating a person's or customer's biometric identifier or biometric information without obtaining consent for that disclosure, redisclosure or dissemination, with limited exceptions, none of which are appliable here. 740 ILCS 14/15(d).

114.    Defendant is an entity registered to do business in Illinois and thus it qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

115.    Plaintiffs are each an individual who had their "biometric identifiers" (in the form of their fingerprints or hand geometry) collected by Defendant, as explained in detail above. *See* 740 ILCS 14/10.

116.    Plaintiffs' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

117.    Defendant systematically and automatically disclosed, redisclosed, or otherwise disseminated Plaintiffs' biometric identifiers or biometric information without obtaining the Plaintiffs' consent required by 740 ILCS 14/15(d)(1).

118.    By disclosing, redisclosing, or otherwise disseminating Plaintiffs' biometric identifiers and biometric information without their consent as described herein, Defendant violated BIPA *each time* there was a disclosure, redisclosure or dissemination of the Plaintiffs' biometric identifiers in violation of Plaintiffs' right to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS 14/1, *et seq*.

119.    Defendant knew, or was reckless in not knowing, that the biometric-enabled NCR POS systems, including biometric timekeeping devices, used would be subject to the provisions of BIPA, a law in effect since 2008, yet completely failed to comply with the statute, or otherwise intentionally or recklessly failed to comply with Section 15 (b) of BIPA.

120.    Alternatively, Defendant negligently failed to comply with Section 15(d) of BIPA by failing to adhere to the reasonable standard of care in its industry with respect to biometric information and the mandates of Section 15(d) of BIPA.

121.    "[T]he plain language of section 15(d) supports the conclusion that a claim accrues upon each transmission of a person's biometric identifier or information without prior informed consent." *White Castle System, Inc*., 2023 IL 128004 at ¶ 29.

122.    Plaintiffs seek statutory damages of $5,000 for each willful and/or reckless violation of Section 15(d) BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation pursuant to 740 ILCS 14/20(1); and reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant declaring that Defendant's actions, as set forth above, violate BIPA; enjoining Defendant from committing further violations of BIPA; awarding Plaintiffs statutory, liquidated damages for each of Defendant's violations of BIPA; and awarding Plaintiffs their reasonable litigation expenses and attorneys' fees pursuant to 740 ILCS 14/20.

## JURY DEMAND

Plaintiffs hereby respectfully demand a trial by jury.

*Respectfully submitted,*

**WENDY TURNER, OLIVIA THOMPSON and AIDEN NUNEZ**


*/s/ Adam J. Feuer*

Adam J. Feuer
Majdi Hijazin
DC LAW, PLLC
20 North Clark Street
Suite 3300
Chicago, Illinois 60602
(872) 804-3400
adam@chicagojustice.law
majdi@chicagojustice.law

Nick Wooten
DC LAW, PLLC
1012 West Anderson Lane
Austin, Texas 78757
(512) 220-1800
nick@texasjustice.com
*Lead Trial Attorney*

*Counsel for Plaintiffs*